IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| STEPHEN P. ALMS, )<br>)<br>Plaintiff, )<br>v. )<br>)<br>CARDINAL LOGISTICS )<br>MANAGEMENT CORPORATION, )<br>)<br>Defendant. )<br>)<br>) | 1:19CV811 |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on Defendant Cardinal Logistics Management Corporation's Amended Motion for Summary Judgment [Doc. #28] on claims of age discrimination and common law wrongful discharge. For the reasons that follow, the motion is denied.

I.

The following facts are undisputed unless otherwise noted. Plaintiff Stephen P. Alms ("Mr. Alms") was terminated by his employer, Cardinal Logistics Management Corporation ("Cardinal"), on or about November 13, 2018 at the age of 47. (Charge of Discrimination, Compl., Ex. 2. [Doc. #1] ("Charge of Discrimination"); Declaration of Andrew Lesinski ¶ 10 (Oct. 1, 2020), Def's Am. Mem. in Supp. of Mot. for Summ. J., Ex. D [Doc. # 29].) He alleges he was replaced by 28-year-old Heath Kirkley ("Mr. Kirkley"), who began a second term of employment with Cardinal on November 12, 2018—the day before Mr. Alms was

terminated. (Charge of Discrimination; Lesinski Decl. ¶ 16.) Mr. Alms was initially hired as a General Manager of Greatwide Logistics Services, LLC ("Greatwide") in 2013. (Deposition of Stephen P. Alms 32:25-33:3 (Mar. 27, 2020), Pl.'s Mem in Resp. to Def's Mot. for Summ. J., Ex. 6 [Doc. #32].) The same year, Greatwide became an affiliate of Cardinal, a domestic motor carrier corporation headquartered in Concord, North Carolina, as part of a merger. (Id. 32:25-33:22; Deposition of Charles Robinson 11:5-12, 75:2-7 (Sept. 16, 2020), Def's Am. Mem. in Supp. of Mot. for Summ. J., Ex. B; Lesinski Decl. ¶ 2.)

As related to Mr. Alms' claims, Cardinal has three divisions: its dedicated motor carrier division ("Dedicated"), the Am-Can division (previously "under" Greatwide) ("Am-Can"), and its brokerage division ("Brokerage"). (Lesinski Decl. ¶ 4.) The divisions were overseen at all relevant times by Charles "Chip" Robinson ("Mr. Robinson"), who was also Mr. Alms' supervisor at the time his employment was terminated, Steven Lusty ("Mr. Lusty"), and Andrew Lesinski ("Mr. Lesinski"), respectively. (Lesinski Decl. ¶ 5; Declaration of Steven Lusty ¶¶ 1, 2 (Oct. 1, 2020), Def's Am. Mem. in Supp. of Mot. for Summ. J., Ex. E; Robinson Dep. 10:16-23.)

In March 2017, after the loss of a prominent Greatwide client, Mr. Robinson created a position for Mr. Alms as the Senior Manager of Special Projects within the Cardinal organization, a role which existed at the intersection of the three divisions and was intended to support the "cross-pollination" of resources between them. (Alms Dep. 37: 19-39:22; Robinson Dep. 13:20-14:17, 24:1-25:18, 65:4-

2

23.)  Shortly after, in January 2018, Mr. Alms became the Senior Manager of Business Development, with the expectation of generating revenue for the organization through this cross-pollination of resources he had developed as the Special Projects manager. (Id. 38:1-40:17, 41:20-42:13; Robinson Dep. 24:1-25:24, 80:7-14; Lesinski Decl. ¶ 8.)  In his deposition, Mr. Alms described the job change as a simple title change, rather than a substantive shift in responsibility. (Alms Dep 40:1-4, 41:20-42:7).  In both the Special Projects and Business Development manager positions, which Cardinal contends were new and unique positions created by Mr. Robinson for Mr. Alms (Robinson Dep. 24:1-25:1), Mr. Alms was directly supervised by Mr. Robinson in the Dedicated division (Alms Dep. 42:14-19), but received his salary from the budgets of the Dedicated, Am-Can, and Brokerage divisions. (Lesinski Decl. ¶ 11; Lusty Decl. ¶ 10).

In July 2018, Mr. Robinson provided Mr. Alms with his annual performance review for the period of April 1, 2017 to March 31, 2018, which indicated that Mr. Alms met or exceeded the stated goals in most of the categories measured, including revenue and profit margin within the Dedicated division. (2018 Employee Performance Appraisal Form, Pl.'s Mem in Resp. to Def's Mot. for Summ. J., Ex. 6 [Doc. #32] ("Alms 2018 Appraisal Form").)  The performance review noted that the revenue goal for the Dedicated operations that reported to Mr. Robinson was $119 million with the actual revenue generated as $122 million—exceeding expectations. (Id.; Deposition of Charles Robinson 35:9-24 (Sept. 16, 2020), Pl.'s Mem in Resp. to Def's Mot. for Summ. J., Ex. 1.)  Similarly, the review reflected

that the profit margin "exceeded plan slightly when exceptions [such as taxes or equipment expenses] accounted." (Alms Appraisal Form; Robinson Dep. 36:5-22.) In fact, Mr. Robinson stated in his deposition that "[Mr. Alms] always had an excellent or above average performance review" in the time he worked for Mr. Robinson. (Robinson Dep. 82:20-83:3; Alms Dep. 45:4-16.) The only weakness Mr. Robinson noted of Mr. Alms' performance prior to his termination was that he should "be as precise and succinct as possible when conveying an idea," (Alms 2018 Appraisal Form), i.e. he "had a tendency to talk a lot," (Robinson 38:25-39:5). Otherwise Mr. Alms had a "[g]reat depth of industry knowledge," "[w]ork[ed] well with others in Dedicated, Am[-]Can and Brokerage," and "[h]a[d] industry contacts that [we]re beneficial," as well as "a variety of skills and perspectives that [we]re unique." (Alms 2018 Appraisal Form.)

Nonetheless, in the latter part of 2018, Mr. Robinson concluded that Mr. Alms was not generating sufficient revenue in the position created for him to justify its continuance. (Robinson Dep. 25:21-26:14, 31:24-32:5; Lesinski Decl. ¶ 8; Lusty Decl. ¶ 6.) During this time, however, Cardinal's overall sales and revenue were not similarly stagnant, but rather were seemingly in a place of financial health. (Robinson Dep. 35:9-24, 36:5-22, 50:13-52:1.) Before terminating Mr. Alms' employment, Mr. Robinson had not told him or indicated to him in any way that he was not generating sufficient revenue or other benefits. (Alms Dep. 68:6-69:1, 132:5-133:14, 134:1-7.) And while Mr. Alms understood the expectation that a "position has to pay for itself" to justify its existence, he

4

"absolutely" thought he was doing so through various "process improvements, cross-functional sales," and other aspects of his performance. (Alms Dep. 134:8-135:1.)

Prior to November 2018, Mr. Robinson had an internal discussion with Mr. Lesinski and Mr. Lusty, among others, to determine whether they had or knew of an open position in which Mr. Alms' skills could be better utilized. (Robinson Dep. 29:4-19; 54:3-19; Lesinski Decl. ¶ 9; Lusty Decl. ¶ 7.) There were no available positions. (Lesinski Decl. ¶ 9; Lusty Decl. ¶ 7.) Afterwards, Mr. Robinson decided to eliminate Mr. Alms' position and informed Mr. Alms of this decision on November 9, 2018. (Robinson Dep. 26:1-20; Alms Dep 132:5-25.)

During this conversation, Mr. Robinson told Mr. Alms that though there was no open position currently available of which Mr. Robinson was aware, Mr. Alms was welcome to apply to any such opening he found within the Cardinal organization. (Robinson Dep 26:1-20, 30:6-15, 106:10-17.) However, at one point in his deposition, Mr. Robinson noted that Mr. Alms "was not given the option to apply for internal positions that were available or that may come available [through the end of the year]," (Id. 87:11-24).[1] Though Mr. Robinson offered Mr. Alms the option of receiving a severance package or working through the end of

---

[1] This quote is inconsistent with Mr. Robinson's earlier and later deposition testimony in which he stated that Mr. Alms *was* offered the choice of an immediate severance package or to work until the end of the year and be able to apply for any position that might open up in the meantime. (See, e.g., Robinson Dep. 26:1-20, 30:6-15,106:6-17.)

5

the year, Mr. Alms never returned to work after November 9, 2018 and his employment was ultimately terminated on November 13, 2018. (Id. 26:1-20.)

Meanwhile, in the months prior to Mr. Alms' termination, Mr. Lesinski began a dialogue with then-28-year-old Heath Kirkley ("Mr. Kirkley"), who had been employed by Mr. Lesinski in Cardinal's Brokerage division from May 2015 until May 2018, about returning to the Senior Operations and Integration Manager position within the division. (Lesinski Decl. ¶ 16; Deposition of Heath Kirkley 44:12-45:13 (Sept. 16, 2020), Def's Am. Mem. in Supp. of Mot. for Summ. J., Ex. C.) The talks were fruitful, and Mr. Kirkley was ultimately hired into his previous role by Mr. Lesinski on November 5, 2018 and began his employment on November 12, 2018. (Charge of Discrimination; Lesinski Decl. ¶ 16; Kirkley Dep. 48:10-22.)

It was also during this period that Mr. Robinson and Mr. Lesinski discussed Mr. Alms' job performance, his apparent lack of revenue generation in his position, and any potential openings Mr. Lesinski might know of that would fit Mr. Alms' skillset. (Lesinski Decl. ¶ 9; Robinson Dep. 67:18-69:23.) Mr. Lesinski did not mention the Senior Operations and Integration Manager position opening, although Mr. Robinson agreed during his deposition that it is a job for which Mr. Alms could have been qualified, even if he was never considered or did not have the opportunity to apply. (Lesinski Decl. ¶ 9; Robinson Dep. 66:18-23 ("I mean, it's not a job I'm hiring for, so I don't know. But it looks like something [Mr. Alms] could do.").)

6

Mr. Robinson was not aware of or involved in the decision to re-hire Mr. Kirkley. (Robinson Dep. 28: 16-21, 57:12-14, 83:12-84:6.)  Nor did Mr. Robinson supervise Mr. Kirkley or contribute to his salary; rather, Kevin Williams ("Mr. Williams") and Mr. Lesinski oversaw Mr. Kirkley's work and Mr. Kirkley's salary was paid for from the Brokerage division's budget alone. (Robinson Dep. 18:5-19:6; Kirkley Dep. 31:3-8, 46:22-47:11; Lesinski Decl. ¶¶ 16-18; Lusty Decl. ¶ 10.)  As Senior Operations and Integration Manager, Mr. Kirkley provided support and oversight for the different branches and branch managers within the Brokerage division and worked to increase its revenue and profitability while managing existing and potential relationships with customers and outside motor carriers. (Kirkley Dep. 46:17-47:3; Lesinski Decl. ¶ 17.)

Given the tight temporal nexus between Mr. Alms' termination and Mr. Kirkley's hiring, as well as several shared or overlapping job responsibilities, Mr. Alms believes that Mr. Kirkley replaced him. (Charge of Discrimination; Heath Kirkley job description, Pl.'s Mem in Resp. to Def's Mot. for Summ. J., Ex. 5 ("Kirkley job description"); Alms Dep. 138:19-139:6, 142:1-143:2.)  In Mr. Alms' deposition, he states that of the nine wide-ranging bullet points describing Mr. Kirkley's role and responsibilities in the Senior Operations and Integration Manager job description, he performed seven before he was terminated. (Alms Dep. 138:19-139:6, 142:1-143:2.)  Conversely, according to Mr. Robinson, the job description was a "generic" advertisement for a role in the Brokerage division, providing responsibilities that "all of [Cardinal] endeavor[s] in," rather than a direct bullet-by-

7

bullet comparison between Mr. Alms' and Mr. Kirkley's positions. (Robinson Dep. 21:17-20, 64:13-24; Lesinski Decl. ¶ 20.)

Mr. Robinson said further that after Mr. Alms' termination, his job duties went back to the individuals who handled them before Mr. Alms' position was created. (Robinson Dep. 25:2-20.) Similarly, Mr. Kirkley said that he was not Mr. Alms' replacement, but rather his *own* replacement, re-assuming a position he vacated earlier in 2018. (Kirkley Dep. 60:8-21, 62:22-63:4, 65:15-66:16.) Notably though, while Cardinal contends that Mr. Kirkley returned to his same position, the job itself was not precisely the same, with at least slightly different duties. (Id. 30:18-31:2, 33:18-34:5, 44:23-45:14 ("I felt more confident this time that I could actually work that job because the five or six months I was gone, other people had to take over all the other things that I couldn't get off my plate. So I felt more confident in working there and in that position, knowing that I don't have to do those things anymore and feel that pressure.").) However, both Mr. Robinson and Mr. Kirkley agree with Mr. Alms to an extent that there was overlap between Mr. Kirkley's job description and Mr. Alms' job duties, whether those duties were also shared by others throughout Cardinal. (Robinson Dep. 21:17-20, 64:13-24; Kirkley Dep. 118:18-126:24.)

Following his termination, Mr. Alms filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), received a Dismissal and Right to Sue from the EEOC, and filed a Complaint alleging age discrimination in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29

U.S.C. § 621, and common law wrongful discharge in violation of the North Carolina Equal Employment Practices Act ("EEPA"), N.C. Gen. Stat. § 143-422.1. (Charge of Discrimination, Compl., Ex. 2 [Doc. #1]; Dismissal and Right to Sue, Compl., Ex. 1; Compl. ¶ 1.) Cardinal moved for summary judgment on both counts.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence presented could permit a reasonable factfinder to find for the nonmoving party, while "[a] fact is material if it might affect the outcome of the litigation." Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 568 (4th Cir. 2015); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). When reviewing a motion for summary judgment, a court must view the evidence and any reasonable inferences in a light most favorable to the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

A court does not, however, make credibility determinations or weigh the evidence, see Variety Stores, Inc. v. Wal-Mart Stores, Inc., 888 F.3d 651, 659-60 (4th Cir. 2018), but rather "determine[s] whether there is a genuine issue for trial," Anderson, 477 U.S. 249. Once the movant makes a summary judgment motion, "[t]he burden is on the nonmoving party to show that there is [such] a genuine issue of material fact for trial . . . by offering sufficient proof in the form of

9

admissible evidence," Guessous v. Fairview Prop. Invs., LLC, 828 F.3d 208, 216 (4th Cir. 2016) (internal citations and quotations omitted), which is not "merely colorable," but "significantly probative" of a jury verdict in its favor, Holland v. Wash. Homes, Inc., 487 F.3d 208, 213 (4th Cir. 2007) (quoting Anderson, 477 U.S. at 249-50).

A.

As relevant here, the ADEA forbids an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). Specifically, the ADEA protects employees who are forty years of age or older. 29 U.S.C. § 631(a). Essentially, "[a]n employee who alleges that h[is] employer violated this prohibition 'must prove by a preponderance of the evidence (which may be direct or circumstantial), that age was the 'but-for' cause of the challenged employer decision.'" Westmoreland v. TWC Admin. LLC, 924 F.3d 718, 725 (4th Cir. 2019) (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 177-78 (2009)). Meanwhile, common law wrongful discharge claims under the NCEEPA are held to "the same standards that apply under the ADEA." Rishel v. Nationwide Mutual Ins. Co., 297 F. Supp. 2d 854, 875 (M.D.N.C. 2003) (dismissing NCEEPA wrongful discharge claim "because [p]laintiff's ADEA claim fail[ed]") (citing Alderman v. Inmar Enters., Inc., 201 F. Supp. 2d 532, 546 (M.D.N.C. 2002)).

10

A plaintiff may avert summary judgment and establish a claim for age discrimination through direct or circumstantial evidence, Gross, 557 U.S. at 177-78, or through the burden-shifting, "pretext" framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973) and its progeny, see Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284 (4th Cir. 2004) (en banc); see also Mereish v. Walker, 359 F.3d 330, 334 (4th Cir. 2004).

Under the McDonnell Douglas pretext method, Mr. Alms must initially establish a prima facie case showing (1) he was a member of a protected class, i.e. over 40 years of age; (2) he suffered an adverse employment action; (3) he was performing his job duties at a level that met Cardinal's legitimate expectations at the time of the adverse employment action; and (4) his position remained open or was filled by a similarly qualified applicant outside the protected class. See Hill, 354 F.3d at 285. If Mr. Alms makes the prima facie showing, the burden then shifts to Cardinal to "rebut th[is] presumption of discrimination" by articulating "a legitimate, nondiscriminatory reason" for the adverse employment action. Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981); see also Westmoreland, 924 F.3d at 725. Cardinal's burden at this second stage "is one of production, not persuasion" and "involve[s] no credibility assessment." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000).

Finally, if Cardinal articulates a legitimate, nondiscriminatory reason for terminating Mr. Alms' employment, the burden shifts again to Mr. Alms to "prove by a preponderance of the evidence that the legitimate reason offered by [Cardinal]

11

w[as] not its true reason[], but w[as] a pretext for discrimination," Burdine, 450 U.S. at 253, and is "unworthy of credence," Reeves, 530 U.S. at 143. The final burden on Mr. Alms "merges with the ultimate burden of persuading the court that [he] has been the victim of intentional discrimination." Burdine, 450 U.S. at 256; see also Mereish, 359 F.3d at 334.

There is no dispute that Mr. Alms is a member of the protected class and suffered an adverse employment action, given that he was 47 years old when his employment was terminated. The question, then, is whether Mr. Alms can demonstrate that he was meeting Cardinal's legitimate expectations at the time he was terminated and if Mr. Kirkley or anyone else outside the protected class replaced Mr. Alms (or the position remained otherwise open) after his termination. A reasonable jury could find that Mr. Alms was meeting Cardinal's legitimate expectations, as evidenced by his performance review and Mr. Robinson's testimony. Cf. Warch v. Ohio Cas. Ins. Co., 435 F.3d 510, 517-18 (4th Cir. 2006) (concluding the plaintiff did not show he met his employer's expectations when he had been "reprimanded concerning 'several issues pertaining to [his] performance and efforts'"); Waters v. Logistics Mgmt. Institute, 716 F. App'x 194, 197 (4th Cir. 2018) (unpublished) (finding the plaintiff failed to meet his employer's legitimate expectations when he received poor performance reviews for ten years). His performance review, encompassing the fiscal year in which he served as both Senior Manager of Special Projects and Business Development, indicates he met or exceeded expectations in nearly all metrics, including revenue and profit margin.

12

(Alms 2018 Appraisal Form.)  Mr. Robinson himself stated that he did not give Mr. Alms a negative performance review in the time he worked for him and thought well enough of Mr. Alms' capabilities to create two positions for him within Cardinal. (Robinson Dep. 82:20-83:3.)

However, Cardinal argues that Mr. Alms did not meet Mr. Robinson's and Cardinal's legitimate expectation that he would generate sufficient revenue or other benefits to justify continuing his new, experimental position. (Robinson Dep. 26:1-14, 31:24-32:5, 67:18-68:1; Lesinski Decl. ¶ 8; Lusty Decl. ¶ 6.)  Though it is the province "of the decision maker which is relevant, not the self-assessment of the plaintiff" to measure job expectations and performance, Hawkins v. PepsiCo, Inc., 203 F.3d 274, 280 (4th Cir. 2000), Mr. Alms understood the expectation that his position had to pay for itself and add value to Cardinal to make it worth continuing, (Alms Dep. 134:8-21).  Despite Cardinal's claims, however, there is reasonable evidence for a jury to conclude that Mr. Alms was meeting Cardinal's expectation of him, as is demonstrated by his 2018 performance review, given mere months before his position was eliminated.

Similarly, a reasonable jury could find that Mr. Kirkley replaced Mr. Alms. The Senior Operations and Integration Manager job description, generically written or not, reflected significant overlap between Mr. Kirkley's and Mr. Alms' respective responsibilities.  See Duffy v. Belk, 477 F. App'x 91, 94-95 (4th Cir. 2012) (unpublished) ("We have determined that the transfer of some of a terminated plaintiff's duties to younger workers is sufficient to satisfy the fourth element of a

prima facie case of age discrimination.") (citing Reed v. Buckeye Fire Equip., 241 F. App'x 917, 927 (4th Cir. 2007)). Mr. Kirkley also began his second term of employment in the days after Mr. Robinson told Mr. Alms that his position was being eliminated and the day before Mr. Alms was officially terminated. (Charge of Discrimination; Lesinski Decl. ¶ 16.) And though Mr. Alms likely could have performed the job of Senior Operations and Integration Manager, (Robinson Dep. 66:18-23), and though Mr. Lesinski's discussions with Mr. Kirkley occurred around the time Mr. Robinson asked him if there were any available positions for Mr. Alms, (Lesinski Decl. ¶¶ 9, 16; Robinson Dep. 67:18-69:23; Kirkley Dep. 48:10-22), Mr. Alms was not given the opportunity to apply and was not aware that the position was available.

Mr. Kirkley and Mr. Alms were in different divisions, had different supervisors, and were paid salaries from different budgets. (Lesinski Decl. ¶ 11, 16-18; Lusty Decl. ¶ 10.) Mr. Kirkley also returned to a position he held previously, albeit in an at least slightly different capacity. (Kirkley Dep. 30:18-31:2, 33:18-34:5, 44:23-45:14.) However, there is circumstantial evidence for a reasonable jury to determine that Mr. Kirkley did replace Mr. Alms.

Because a reasonable jury could conclude Mr. Alms met his prima facie burden, Cardinal must demonstrate a legitimate, nondiscriminatory reason for his termination. See Burdine, 450 U.S. at 256. Here, Cardinal must "merely articulate a justification that is 'legally sufficient to justify a judgment' in [its] favor." Mereish, 359 F.3d at 335 (quoting Burdine, 450 U.S. at 255). Mr. Robinson and

14

other Cardinal employees state that Mr. Alms' newly-created, experimental position was eliminated because it was not generating sufficient revenue or other benefits. And because no other suitable position was apparently available, Mr. Alms' employment was terminated. This is the type of "strategic business decision" which constitutes a legitimate, nondiscriminatory reason for an adverse employment action, recognized both within this Circuit, as well as others. Mereish, 359 F.3d at 335 (citing Schuster v. Lucent Techs., Inc., 327 F.3d 569, 571 (7th Cir. 2003) (viewing as a legitimate reason for discharge "an effort to address adverse financial conditions")). It is also the type of "obstruct[ion] [to] the ability of a commercial enterprise to make necessary adjustments in the face of economic challenges" in which a court does not wish to engage. Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 513 (4th Cir. 1994); see also Henson v. Liggett Grp., Inc., 61 F.3d 270, 277 (4th Cir. 1995) (finding that "[a]s long as the employer does not violate the ADEA," it is "important [to] giv[e] [the] employer the latitude and autonomy to make business decisions, including workplace reorganization"); EEOC v. Clay Printing Co., 955 F.2d 936, 946 (4th Cir. 1992).

Because Cardinal has stated a legitimate, nondiscriminatory reason for eliminating Mr. Alms' position, the burden shifts to Mr. Alms to show that Cardinal's legitimate reason "w[as] not its true reason, but w[as] a pretext for [age] discrimination." Westmoreland, 924 F.3d at 726. The evidence, as stated previously, demonstrated that (1) Mr. Alms was a well-reviewed employee who exceeded expectations in revenue generation and profit margins during at least part

15

of his tenure as Senior Manager of Business Development; (2) 28-year-old Mr. Kirkley was hired by Mr. Lesinski in or around the time Mr. Lesinski was aware that Mr. Robinson was considering eliminating Mr. Alms' position and was seeking other opportunities for him within Cardinal; (3) Mr. Alms did not receive the opportunity to apply for Mr. Kirkley's Senior Operations and Strategic Manager role, although he could have been qualified for the position; and (4) Mr. Kirkley performed some of the same duties as Mr. Alms after Mr. Alms' position was terminated.  Taken together, this creates a genuine dispute of material fact as to whether Cardinal terminated Mr. Alms because of his age.

B.

Summary judgment is also denied with respect to Mr. Alms' constructive discharge claims in violation of the NCEEPA.  Given that wrongful discharge claims under NCEEPA are held "to the same standards that apply under the ADEA," Rishel, 297 F. Supp. 2d at 875, when summary judgment is denied for the latter, it also should be for the former. Id.; see also Smith v. Premier Property Mgmt., 793 F. App'x 176, 177 n.1 (4th Cir. 2019) (unpublished).

III.

For the reasons stated in this Memorandum Opinion, IT IS HEREBY ORDERED that Defendant Cardinal Logistics Management Corporation's Amended

16

Motion for Summary Judgment [Doc. #28] is DENIED.

This the 14th day of December, 2020.

                                                <u>/s/ N. Carlton Tilley, Jr.</u>
                                               Senior United States District Judge